**Affirmed and Majority and Dissenting Opinions filed December 19, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00977-CV

**BRAZOS CONTRACTORS DEVELOPMENT, INC., Appellant**

**V.**

**HENRY JEFFERSON, Appellee**

**On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Cause No. 2014-28653**

## MAJORITY OPINION

Appellee Henry Jefferson sued appellant Brazos Contractors Development, Inc. ("Brazos"), seeking damages for injuries incurred after an accident at a construction site. The parties proceeded to trial and the jury returned a verdict for Jefferson. Brazos appealed and asserts issues challenging (1) the jury charge and the jury's responses thereto; (2) the sufficiency of the evidence to support the jury's liability findings; and (3) the sufficiency of the evidence to support the jury's damages awards. For the reasons below, we affirm.

BACKGROUND

In 2012, Realm Realty retained Brazos as general contractor to oversee the construction of a Dollar Tree store in Houston (the "Dollar Tree project"). Brazos hired subcontractors to work on the project, one of which was T&T Hoisting ("T&T"), a steel erection company owned and managed by Rebecca Rutherford. Rutherford hired two crew members from Craigslist to work on the Dollar Tree project. Jefferson, another member of the Dollar Tree project crew, had worked on prior T&T projects.

The T&T-Brazos subcontract was procured by W.T. Lander, who owned and operated Rutland Construction Services ("Rutland"). Rutland brokered construction contracts and previously had secured several contracts for T&T. The T&T-Brazos subcontract states, in relevant part:

> **DESCRIPTION OF WORK:** In accordance with the project specifications and drawings, the Subcontractor will furnish and pay for all necessary: . . . Labor, tools, insurances, taxes, and equipment to complete the construction in a timely, professional, and workmanlike manner. Labor only for the erection of all steel as per plans and under the direction of David Kaszak.

David Kaszak was Brazos's project manager for the Dollar Tree project. The project was scheduled to begin on May 17, 2012, and conclude six days later.

## I. Jefferson's Accident

On May 21, 2012, the T&T crew was installing steel cross braces to the store's frame. Jefferson was hit in the face with a steel brace during the installation process, sustaining multiple fractures, and then was taken by ambulance to a regional hospital and transferred via Life Flight to a major trauma hospital.

The jury heard conflicting evidence with respect to most of the relevant

events precipitating Jefferson's accident. There was no consensus regarding who controlled the job site, who directed the installation of the cross braces, the proper procedure for cross-brace installation, or how the accident occurred.

*Control over the Job Site*. A great deal of testimony at trial was devoted to developing evidence regarding control of the work at the Dollar Tree project.

According to Rutherford and Lander, Kaszak was told (before the Dollar Tree project began) that T&T's foreman was working on a separate job and would be unavailable for the Dollar Tree project. Rutherford and Lander testified that Kaszak said he would run the T&T crew himself.

Kaszak testified, denying that he said he would supervise the T&T crew. According to Kaszak, Jefferson was "in charge" of the T&T crew. Kaszak also said he had no training or experience with the erection of cross braces. Kaszak had been at the site of the installation earlier that day but was not at the job site when the accident occurred.

Andre Simon, a member of the T&T crew working at the Dollar Tree project, recalled seeing an unnamed man "who carried a set of plans with him" and was at the job site about 70-80% of the time. Simon said the man instructed the crew with respect to steel erection and "was the one directing things" on the job site. But Simon also testified that Jefferson "was the guy making the day-to-day decisions and assignments for the T&T crew" and was the ultimate authority with respect to how to do the job.

According to Jefferson, if Rutherford and Lander were not on the job site, he was in charge of giving directions to the other crew members.

*How the Accident Occurred*. The jury heard testimony from two witnesses who were present at the time of the accident: Jefferson and Simon.

According to Jefferson, he, Simon, and James[1] were working at the Dollar Tree project on the day of the accident. Describing Simon and James as "rookies," Jefferson said they were inexperienced with respect to steel erection. At the time of the accident, Jefferson said James was operating the forklift and maneuvering a cross brace towards Simon, who was standing on scaffolding. According to Jefferson, Simon failed to grab the top of the brace and the brace "started swinging in the air," eventually hitting Jefferson in the face.

At trial, defense counsel also played portions of Jefferson's deposition describing the accident. In his deposition, Jefferson stated that an additional person was at the job site the day of the accident: a man named Javier who had been sent by Rutherford and Lander to help the T&T crew install the cross braces. Jefferson said Javier was "right there beside him" and had instructed him to connect the cross brace beginning with the bottom. Jefferson said "they didn't have ahold of [the brace] up on top" and it swung into him while he was trying to connect it.

Simon's description of the accident was markedly different. Simon said four men were working at the job site the day of the accident: Simon, Jefferson, James, and a man named Bashar Dawlett, who was operating the forklift. Simon testified that each cross brace was raised by the forklift, attached at the bottom corner of the steel frame, and then attached at the top of the steel frame. Simon stated that either Jefferson or Dawlett changed the procedure for attachment of the final brace and ordered that it be connected at the top of the frame first. Simon said that after the brace was connected to the top of the frame, Jefferson was trying to connect the brace at the bottom of the frame when it got stuck on the frame's column. Using the forklift, Dawlett continued to raise up on the brace while Simon and James

---

[1] The witnesses that mentioned James in their testimony did not recall his last name.

4

yelled at him to stop; Simon said the brace bowed until it came loose and hit Jefferson in the face.

Dawlett testified at trial and said while he was not present at the Dollar Tree project at the time of the accident, he had been at the job site "for about an hour" earlier that morning. Dawlett recalled seeing four T&T crew members working at the site: one driving a forklift, one on the phone, and two working on scaffolding.

George Charles, Jr., a construction consultant, testified as an expert witness. When questioned regarding Simon's and Jefferson's conflicting accounts of the accident, Charles agreed with Simon's version of events and stated he "believe[d] the brace got hung up or stuck. Based upon my experience in the industry, that would be the most likely probability of what happened on this particular brace."

Rutherford said she spoke with Simon and James after the accident and was informed the brace was attached at the top of the steel frame when the bottom bowed out and hit Jefferson, corroborating Simon's testimony at trial.

***Proper Procedure for Cross-Brace Installation.*** Simon testified that there was a change in the cross-brace installation procedure (from a bottom-to-top installation to a top-to-bottom installation). But the evidence was not conclusive with respect to whether either of these methods is the "correct" installation method.

Testifying at trial, Rutherford and Devin Bendon (a T&T crew member who was not working on the day of Jefferson's accident) acknowledged that cross braces can be installed both ways. But according to Lander, Simon, and Charles, cross braces should be installed bottom-to-top.

***The Forklift Used for Cross-Brace Installation.*** Evidence also was developed with respect to the type of forklift used during the cross-brace installation.

When work on the Dollar Tree project began, T&T's forklift was not

5

available and Brazos rented a forklift for the installation. According to Kaszak, Lander said he wanted a telescopic-boom forklift for the project but only a straight-mast forklift was available for rent. Kaszak testified that a telescopic-boom forklift is preferred in the steel erection trade and stated it would make the job easier and faster. Charles also opined that a straight-mast forklift was not the proper type of equipment to use during the cross-brace installation. Rutherford and Lander both testified that a straight-mast forklift was fine for the cross-brace installation.

## II.     Trial

In May 2014, Jefferson sued Brazos, Rutherford d/b/a T&T, and Lander d/b/a Rutland, asserting claims for injuries arising out of the May 2012 accident. The parties proceeded to trial in June 2017 and the jury heard evidence addressing the parties' business relationships, the accident, and Jefferson's injuries. The jury charge separately inquired whether Brazos was negligent under three different theories of negligence: (1) negligently breaching a duty of care arising from a contractual duty of control; (2) negligently breaching a duty of care arising from an actual exercise of control; and (3) negligently performing services undertaken for Jefferson's protection. With respect to these theories, the jury charge stated as follows:

> Question No. 1
>
> Did the negligence, if any, of Brazos Contractors Development, Inc. proximately cause the injuries sustained by Henry Jefferson?
>
> For the purposes of this question only, you are instructed that Brazos Contractors Development, Inc. retained some control over the erection of the steel frame, other than the right to order the work to start or stop or to inspect progress or receive reports.
>
> *          *          *
>
> Answer "Yes" or "No."
>
> Answer: _____

<u>Question No. 2</u>

Did Brazos Contractors Development, Inc. exercise some control over the manner in which the cross-braces in question w[ere] installed, other than the right to order the work to start or stop or to inspect progress or receive reports?

Answer "Yes" or "No."

Answer: _____

*  *  *

<u>Question No. 4</u>

Did the negligence, if any, of Brazos Contractors Development, Inc. proximately cause the injuries sustained by Henry Jefferson?

For the purpose of this question only, with respect to installation of the cross-braces at the construction site, Brazos Contractors Development, Inc. was negligent if —

a. Brazos Contractors Development, Inc. undertook to perform services that it knew or should have known were necessary for Henry Jefferson's protection, and

b. Brazos Contractors Development, Inc. failed to exercise reasonable care in performing those services; and either

c. Henry Jefferson relied upon Brazos Contractors Development, Inc.'s performance; or

d. Brazos's performance increased the plaintiffs' [sic] risk of harm.

*  *  *

Answer "Yes" or "No."

Answer: _____

The jury answered "Yes" to Question No. 1 and "No" to Question No. 2. Because Question No. 3 was predicated on an affirmative answer to Question No. 2, the jury did not respond to that question. The jury answered "No" to Question No. 4.

Question No. 5 asked the jury whether Jefferson's injuries were proximately caused by the negligence of (1) Rutherford d/b/a T&T, (2) Lander d/b/a Rutland, or (3) Jefferson. The jury responded "Yes" for Rutherford and Lander and "No" for

7

Jefferson.

Question No. 6 asked the jury to allocate responsibility between Brazos, Rutherford, Lander, and Jefferson, to which the jury responded as follows:

a.     Brazos Contractors Development, Inc.
Answer: 35%

b.     Rebecca Rutherford d/b/a T&T Hoisting
Answer: 35%

c.     WT Lander d/b/a Rutland Construction Services
Answer: 30%

d.     Henry Jefferson
Answer: 0%

Total 100%

The jury awarded damages for past and future physical pain, past and future disfigurement, past and future physical impairment, and future medical care expenses, for a total award of $2.15 million. Of this amount, the jury awarded Jefferson $500,000 for future medical care expenses and $250,000 for future physical impairment. The trial court rendered judgment against Brazos and Rutherford in accordance with the jury's verdict. Brazos timely appealed.[2]

## ANALYSIS

Brazos's issues on appeal address (1) the submission, wording, and materiality of Question No. 1; (2) the sufficiency of the evidence to support the jury's findings with respect to the duty, breach, and proximate causation elements of Jefferson's negligence claim; and (3) the sufficiency of the evidence to support the damages awarded for Jefferson's future medical care expenses and future

_____

[2] Rutherford did not appeal the trial court's final judgment.

physical impairment. We overrule Brazos's issues on appeal and affirm the trial court's final judgment.

**I.      The Trial Court Did Not Err by Submitting Question No. 1 to the Jury or by Entering Judgment for Jefferson Based on the Jury's Finding in Response to Question No. 1.**

In three sub-issues addressing Question No. 1, Brazos asserts (1) there is no evidence Brazos retained contractual control over Jefferson's work or the injury-causing activity; (2) the question misstates the law regarding control and improperly comments on the weight of the evidence; and (3) the jury's response to the question was immaterial. We address these sub-issues individually.

**A.      Brazos Retained Contractual Control Over T&T's Work Under the Terms of the Brazos-T&T Subcontract.**

Question No. 1 inquired whether Brazos was negligent under the theory that Brazos retained a contractual right of control over the erection of the steel frame. Challenging the submission of this question, Brazos contends that, as a matter of law, it did not retain a contractual right of control over the way in which T&T performed its work and therefore owed no duty to T&T's employees, including Jefferson. Brazos raised this objection at the charge conference and received a ruling, thereby preserving the issue for our review. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387-88 (Tex. 2000).

The threshold inquiry in a negligence case "is whether the defendant owes a legal duty to the plaintiff." *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014) (per curiam). A general contractor generally does not owe a duty of reasonable care to an independent contractor's employee.[3] *See Lee Lewis Constr.,*

---

[3] A premises owner and a general contractor owe the same duties to an independent contractor's employee, and cases considering the duties of premises owners are equally applicable to cases concerning general contractors. *See Koch Ref. Co. v. Chapa*, 11 S.W.3d 153,

9

*Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). But a duty of care may arise if the general contractor retains some control over the manner in which the independent contractor performs its work. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002) (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). Texas has adopted section 414 of the Restatement (Second) of Torts, which states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owed a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965); *see also Redinger*, 689 S.W.2d at 418 (adopting section 414).

Control may be established in two ways: (1) by evidence of a contractual agreement that explicitly assigns the general contractor a right to control, or (2) by evidence that the general contractor actually exercised control over the manner in which the independent contractor's work was performed. *Dow Chem. Co.*, 89 S.W.3d at 606; *Lee Lewis Constr., Inc.*, 70 S.W.3d at 783. Here, Brazos asserts it did not retain a contractual right of control over T&T's work as stated in Question No. 1. The parties agree this issue presents a question of law to be determined from the contract's terms. *See Dow Chem. Co.*, 89 S.W.3d at 606 ("[d]etermining whether a contract gives a right of control is generally a question of law for the court").

When reviewing a contract, our goal is to determine the parties' true intentions as expressed in the instrument. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We give the contract's words their plain and ordinary meaning

155 n.1 (Tex. 1999) (per curiam).

unless the contract indicates the parties intended a different meaning. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We also bear in mind the particular business activity to be served and, when possible and proper to do so, we avoid a construction that is unreasonable, inequitable, and oppressive. *See Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). We do not read any provision in isolation but consider each provision with reference to the contract as a whole. *See Coker*, 650 S.W.2d at 393. If the contract's language can be given a definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012) (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)).

To establish a duty of care, a contract must grant the general contractor "the right to control the means, methods, or details of the independent contractor's work" and, at the very least, "the power to direct the order in which work is to be done." *Dow Chem. Co.*, 89 S.W.3d at 606 (citing *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999)). There also must be a nexus between the general contractor's retained control and the condition or activity that causes the injury. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex. 1998) (per curiam). When a party contractually retains a right of control over an independent contractor's work, the failure to exercise that control will not negate the party's potential liability for an on-the-job injury. *Elliott-Williams Co.*, 9 S.W.3d at 804; *see also Johnston v. Oiltanking Houston, L.P.*, 367 S.W.3d 412, 417 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In *Dow Chemical Co.*, the contract at issue clearly disclaimed any retention of a contractual right of control on behalf of the general contractor and stated:

11

"any provisions in this Contract which may appear to give DOW the right to direct CONTRACTOR as to details of doing the work herein covered or to exercise a measure of control over the work shall be deemed to mean that CONTRACTOR shall follow the desires of DOW in the results of the work only." 89 S.W.3d at 606-07. This provision, the Supreme Court concluded, did "not delegate to Dow the right to control the means, methods, or details" of the subcontractor's work as necessary to give rise to a contractual right of control. *Id*. at 607; *see also Jacobs v. Huser Constr., Inc.*, 429 S.W.3d 700, 704-05 (Tex. App.—San Antonio 2014, no pet.) (similar contract language merely gave the general contractor the right to ensure the work met "specifications and schedules" but did not retain "control over the details" of the subcontractor's work).

In contrast, contracts that grant the general contractor broad supervisory control over the independent contractor's work are more likely to give rise to a contractual right of control. *See Arredondo v. Techserv Consulting & Training, Ltd.*, 567 S.W.3d 383, 398-99 (Tex. App.—San Antonio 2018, pet. filed); *see also Redinger*, 689 S.W.2d at 418 (a party that retains "supervisory control" over a subcontractor's work has a duty to exercise that supervisory control with reasonable care) (citing Restatement (Second) of Torts § 414 cmt. a (1965)). In *Arredondo*, the pertinent contractual provision stated: "Contractor shall have an authorized representative at the Site to whom Owner may give instructions at all times when Work is being performed." 567 S.W.3d at 398. Concluding this provision granted the owner a contractual right of control with respect to the independent contractor's work, the court reasoned that the independent contractor "was not entirely free to do its work in its own way" because the owner possessed "the right and discretion to control the means, methods, and details" of the contractor's work. *Id*. at 399.

12

Similarly, the Brazos-T&T subcontract granted broad supervisory control to Brazos via its project manager, Kaszak:

> **DESCRIPTION OF WORK:** In accordance with the project specifications and drawings, the Subcontractor will furnish and pay for all necessary: . . . Labor, tools, insurances, taxes, and equipment to complete the construction in a timely, professional, and workmanlike manner. Labor only for the erection of all steel as per plans *and under the direction of David Kaszak*.

(emphasis added). This provision is one of the first full paragraphs in the subcontract, preceded only by the parties' contact information and the schedule for completion of the work. Its scope is not limited by any other provision in the subcontract.

This provision is unambiguous and we construe its meaning as a matter of law. *See El Paso Field Servs., L.P.*, 389 S.W.3d at 806. The word "direction" is central to our analysis and Black's Law Dictionary provides two definitions of the word consistent with its use in the foregoing provision: "[a]n act of guidance" and "[a]n order; an instruction on how to proceed." *Direction*, Black's Law Dictionary (11th ed. 2019); *see also Direction*, Webster's Third New Int'l Dictionary (3rd ed. 2002) ("guidance or supervision of action, conduct, or operation"). Therefore, according to the plain language of this provision, Brazos (via Kaszak) retained the right to guide, order, and instruct T&T with respect to its work. Testimony at trial also supports this interpretation, because Rutherford and Lander testified that Kaszak said he would run the T&T crew himself. The rights retained by this provision are analogous to those necessary to establish a contractual right of control and granted to Brazos the right to control the means, methods, or details of T&T's work. *See Dow Chem. Co.*, 89 S.W.3d at 606; *Arredondo*, 567 S.W.3d at 398-99.

13

Challenging this conclusion, Brazos points out that the Brazos-T&T subcontract assigned to T&T the responsibility of ensuring its employees' safety.[4] But this section does not negate the provision explicitly assigning to Brazos the right to direct T&T's performance of its work. Moreover, cases analyzing similar contractual control issues have distinguished between provisions addressing affirmative rights with respect to completion of the underlying project and provisions that merely address safety. *See, e.g., Godines v. Parlsey Energy Operations, LLC*, No. 11-16-00139-CV, 2018 WL 2460303, at \*5-6 (Tex. App.—Eastland May 31, 2018, no pet.) (mem. op.).[5]

Asserting this interpretation of the subcontract's provision is "belied by the parties' conduct," Brazos also points to evidence and testimony showing that Kaszak was not giving the T&T crew "blow by blow instructions on how to construct the steel frame." But evidence that a party failed to exercise its contractual control will not negate its liability for an independent contractor's injury. *See Elliott-Williams Co.*, 9 S.W.3d at 804; *Johnston*, 367 S.W.3d at 417.

---

[4] Specifically, the subcontract states: "Subcontractor [T&T] shall take all necessary precautions for the safety of employees on the job/project, and shall comply with all applicable provisions of federal, state and municipal safety laws ordinances, rules, regulations, . . . for the health and safety of persons or property or prevent accidents or injury to persons on, about or adjacent to the premises where the worked is being performed and to prevent loss or damage to property."

[5] The dissent asserts the specific circumstances of Jefferson's injury fall within the subcontract's "Indemnity Provision," which states: "If Subcontractor uses equipment or tools owned or rented by Contractor, Subcontractor shall indemnify and hold harmless Contractor from any liability for all claims, which may result from Subcontractor's use of such equipment or tools. . . . Subcontractor agrees to be solely responsible for safety, training, mechanical and safety devices, inspections and OSHA Compliance prior to equipment use." The dissent also points out that, at the time of the incident, T&T was using equipment rented by Brazos.

The parties have not addressed the interplay between this provision, the "Description of Work" provision, and the specific circumstances of this case either in the trial court or on appeal. Moreover, Jefferson's claims do not "result" solely from T&T's use of tools or equipment rented by Brazos. Instead, Jefferson's claims are predicated on Brazos's failure to use reasonable care in its ***exercise of control*** retained via the subcontract's terms.

14

Accordingly, this evidence does not diminish the right of control retained by the Brazos-T&T subcontract.

The dissent suggests the term "direction" did "not explicitly give Brazos the right to control the operative details of T&T's work" because the term "has a more general meaning" (citing Black's Law Dictionary and two versions of Oxford dictionaries). However, in this case, despite the general meaning of the term "direction" and all of its various definitions, we are not presented with a contract using the term "direction" or "direct" in isolation. Instead, we are presented with a contract that explicitly uses the phrase modifier "under the direction of". This phrase ("under the direction of") has been used in Texas law since at least 1853. *See Hogue v. Sims*, 9 Tex. 546, 547-48 (1853); *see also Walker v. El Paso Elec. Ry. Co.*, 126 S.W. 262, 262-64 (Tex. 1910); *State v. Hoff*, 31 S.W. 290, 298 (Tex. 1895); *Burke v. Thomson*, 29 Tex. 158, 161 (1867) (citing O. & W. Dig. 115); and *Osborne v. State*, 6 S.W. 536, 536 (Tex. Ct. App. 1887). The dissent points to no authority concluding (or even supporting the contention) that the phrase "under the direction of" has ever (much less under comparable circumstances) been ambiguous enough to require interpretation. This court has even used the phrase "under the direction of" as being essentially interchangeable with the word "control." *See Armintor v. Cmty. Hosp. of Brazosport*, 659 S.W.2d 86, 88 (Tex. App.—Houston [14th Dist.] 1983, no writ) ("Community Hospital is a private, non-profit corporation which is governed by an elected board of trustees. Its day-to-day operations are under the direction and control of a hospital administrator."). So has the Texas Supreme Court. *Abalos v. Oil Dev. Co. of Tex.*, 544 S.W.2d 627, 631 (Tex. 1976); *see also Rorie v. City of Galveston*, 471 S.W.2d 789, 792 (Tex. 1971).

The dissent relies upon other cases that are readily distinguishable from this

one, not in the least because the terms "direction" and "direct" are unmodified by another clause therein. In *Shell Oil*, for example, the Texas Supreme Court focused on a clause in the operative contract expressly disclaiming any reservation of right of the general contractor to control the conduct or management of the subcontractor. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004). No similar disclaimer is present here. Additionally, the circumstances presented in *Coastal Marine Services of Texas, Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (per curiam), support our finding of control here, because that case states

> a premises owner may be liable when the owner retains the right of supervisory control over work on the premises. . . . The right to control must be more than a general right to order work to stop and start, or to inspect progress. The supervisory control must relate to the activity that actually caused the injury, and grant the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner.

*Id.* Additionally, a "party can prove control through evidence of an agreement . . . or by evidence that the 'owner actually exercised control over the manner in which the independent contractor's work was performed.'" *Johnston,* 367 S.W.3d at 419 (quoting *Dow Chem. Co.*, 89 S.W.3d at 606).

The usage of the phrase "under the direction of David Kaszak" in this contract is unambiguous and not modified by any other clause disclaiming a reservation of rights; therefore, the dissent's reliance on canons of construction is improper as no interpretation is necessary. Because we conclude the Brazos-T&T subcontract explicitly assigned Brazos a right to control T&T's performance of its work, we overrule Brazos's first sub-issue addressing Question No. 1.

**B.    Brazos Waived Its Argument Challenging Question No. 1's Statement of the Law Regarding Control.**

Arguing that Texas law requires a "specific nexus" between the control and

16

the injury-causing activity, Brazos asserts Question No. 1 "grossly misstated the law by instructing the jury that Brazos retained control over the entire job, namely, erection of the steel frame." Brazos's argument appears to contend that Question No. 1's instruction regarding control should have been limited to "the installation of the cross-brace at issue." Because Brazos did not raise this challenge at the charge conference, this issue is not preserved for our review.

To preserve error in the jury charge, the complaining party must timely and plainly make the trial court aware of the complaint and obtain a ruling. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992); *Bruce v. Cauthen*, 515 S.W.3d 495, 511 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *see also* Tex. R. Civ. P. 274 (requiring a party objecting to a charge to point out distinctly the objectionable matter and the grounds of the objection). Moreover, to preserve error for appeal, the complaining party's argument on appeal must comport with its argument in the trial court. *See, e.g., Wohlfahrt v. Holloway*, 172 S.W.3d 630, 639 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

On appeal, Brazos frames this challenge as an improper comment on the weight of the evidence. In the trial court, Brazos's improper-comment argument was raised as follows:

> With regards to Question No. 1 with the instruction that is included in the Charge as the control we believe is improper instruction superfluous issues to be determined constitute improper [comment] on the weight of the evidence interferes with the service province of the jury, improperly influences the jury to the prejudice of Brazos and there is no evidence or there is insufficient evidence to support any finding of the retention of control over the construction of the steel frame by Brazos.
>
> Therefore, the comment — improperly comments on Texas Law.

This objection does not plainly or distinctly raise the issue Brazos now asserts on appeal — that the instruction included with Question No. 1 lacks a "specific nexus" between the control and the injury-causing activity. Accordingly, Brazos did not preserve this issue for our review. *See* Tex. R. Civ. P. 274; *Payne*, 838 S.W.2d at 241; and *Bruce*, 515 S.W.3d at 511.

We overrule Brazos's second sub-issue addressing Question No. 1.

### C. The Jury's Response to Question No. 1 Was Not Immaterial.

Arguing the trial court should have disregarded the jury's response to Question No. 1, Brazos asserts (1) neither the evidence nor Texas law supports the control instruction, and (2) the jury's findings in response to Questions No. 2, 3, and 4 render the response to Question No. 1 immaterial. We overrule Brazos's immateriality challenges.

A jury question is immaterial when (1) the question should not have been submitted; (2) the question calls for a finding beyond the province of the jury, such as a question of law; (3) the question was properly submitted but has been rendered immaterial by other findings; or (4) when the answer to the question cannot alter the effect of the verdict. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995). Because "immaterial answers cannot support a judgment," the jury's response to an immaterial question is properly disregarded. *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017).

In a conclusory fashion, Brazos asserts "neither the evidence nor Texas law supported the control instruction" in Question No. 1. Based on our analysis in section I.A., we reject this contention. Under Texas law, a general contractor's duty of care to an independent contractor's employee may arise from a contractual agreement. *Dow Chem. Co.*, 89 S.W.3d at 606; *Lee Lewis Constr., Inc.*, 70 S.W.3d

18

at 783. Here, through the Brazos-T&T subcontract, Brazos (via Kaszak) retained the right to "direct[]" T&T's completion of its work. Because of this right to control, Brazos owed T&T and its employees a duty of reasonable care. Therefore, Question No. 1's control instruction finds adequate support in the law and the evidence.

Nor is the jury's response to Question No. 1 at odds with its responses to the other questions addressing Brazos's liability. A general contractor's duty of care to an independent contractor can arise from a contractual agreement *or* from an actual exercise of control. *Dow Chem. Co.*, 89 S.W.3d at 606. Whether a party exercised actual control is a question of fact for the jury. *See MEMC Pasadena, Inc. v. Riddle Power, LLC*, 472 S.W.3d 379, 406 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Question No. 2 properly submitted the issue of actual control and the jury's "No" answer in response to this question does not conflict with its "Yes" response to Question No. 1.

Question No. 4 submitted to the jury Jefferson's negligent undertaking claim. *See Nall v. Plunkett*, 404 S.W.3d 552, 555-56 (Tex. 2013) (per curiam) (listing the elements of a negligent undertaking claim). This claim — which requires findings different from those necessary to sustain liability under a right-of-control negligence theory — properly was submitted as a separate question. *Compare id*. with *Dow Chem. Co.*, 89 S.W.3d at 605-611. The jury's response to this separate theory of liability does not render the response to Question No. 1 immaterial.

We overrule Brazos's final sub-issue addressing Question No. 1.

## II. Legally and Factually Sufficient Evidence Supports the Jury's Findings in Response to Questions No. 1 and 5.

Brazos challenges the sufficiency of the evidence to support the jury's

19

negligence finding in response to Question No. 1 and the jury's no-liability finding as to Jefferson in Question No. 5.

## A. Standards of Review

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference in the verdict's favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit evidence in support of the judgment if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could not do so. *Id*. at 827. If the evidence falls within the zone of reasonable disagreement, we will not substitute our judgment for the fact finder's. *Id*. at 822. Simply stated, we analyze whether the evidence at trial would have enabled reasonable and fair-minded people to reach the verdict that is under review. *Id*. at 827.

For a factual sufficiency review, we consider and weigh all of the evidence both supporting and contradicting the finding under review. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Thomas v. Uzoka*, 290 S.W.3d 437, 452 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). We set aside the challenged finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We do not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam). The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse. *Thomas*, 290 S.W.3d at 452.

## B. Jury's Negligence Finding in Response to Question No. 1

A cause of action for negligence consists of three essential elements: (1) a

legal duty owed by one party to another; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Incorporating these elements, Question No. 1 asked the jury: "Did the negligence, if any, of Brazos Contractors Development, Inc. proximately cause the injuries sustained by Henry Jefferson?" Question No. 1 also provided the following instructions:

> For the purposes of this question only, you are instructed that Brazos Contractors Development, Inc. retained some control over the erection of the steel frame, other than the right to order the work to start or stop or to inspect progress or receive reports.

> "Negligence" with respect to Brazos Contractors Development, Inc. means the failure to use ordinary care in exercising the control you have been instructed that Brazos Contractors Development, Inc. retained. That is, failing to do that which a company of ordinary prudence would have done under the same or similar circumstances or doing that which a company of ordinary prudence would not have done under the same or similar circumstances.

> "Ordinary Care" means that degree of care that would be used by a company or person of ordinary prudence under the same or similar circumstances.

> "Proximate Cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a company using ordinary care would have foreseen that the event, or some similar event, might reasonably result there from. There may be more than one proximate cause of an event.

The jury responded "Yes" to Question No. 1.

Brazos begins its sufficiency challenge by asserting there is no evidence it "exercised actual control over Jefferson's work or the injury-causing activity" as necessary to give rise to a legal duty. We concluded above that the Brazos-T&T subcontract gave rise to a contractual right of control, which imposed on Brazos

21

the duty to use reasonable care in its exercise of that control. *See Dow. Chem. Co.*, 89 S.W.3d at 606. Therefore, we need not address Brazos's contentions regarding an actual right of control.

Brazos also challenges the breach and proximate cause elements of the negligence claim submitted in Question No. 1. We review the sufficiency of the evidence with respect to these elements based on the definitions contained in the jury charge. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002); *Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 283-84 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Brazos centers its argument on the testimony of construction expert Charles, who opined that Brazos breached its duty of care by failing to provide (1) "erection-bracing drawings"; (2) a proper piece of equipment for installing the cross braces; and (3) a competent person to "evaluate what to do if you had a problem . . . ." Brazos asserts these opinions "do not rise to the level of competent evidence" because "they are conclusory and not supported by the evidence." However, evidence and testimony addressing the third identified breach is sufficient to support the breach and proximate cause elements of Jefferson's negligence claim.

### 1. Breach

Discussing the Occupational Safety and Health Administration's ("OSHA") regulations requiring that a "competent person" be present at a job site, Charles testified as follows:

Q.   Okay. What does the term "competent person" mean under the OSHA regulations?

A.   A "competent person" is a person who is able to recognize a potential hazard when it occurs, and he is able to — to solve or resolve that problem.

22

Q. And when do the OSHA regulations require a general contractor to have a competent person on a job site?

A. Requires them to have a competent person [on] site at all times.

Q. Not just when they want?

A. Not just when they want.

Q. Not when they want to take a few hours off and go to lunch?

A. Right.

Q. Okay. What — based on your knowledge, your experience and your review of this case, why do you feel like that is important in this case?

A. Well, I believe had Mr. Kaszak been there and they had a problem installing this brace, he would have been the go-to guy. They could have said, "We're having problems installing this brace."

He would have made the decision on what to do then and — and could have prevented this accident.

Charles also opined that Brazos's failure to have a person on-site who could "evaluate what to do if had you [sic] a problem" caused or contributed to Jefferson's accident.

The breach Charles identified and his opinion regarding its role in the accident finds support in other evidence and testimony at trial. Given that the witnesses provided markedly different accounts regarding who was in control of the job site, who was directing the cross-brace installation, and who was present at the time of the accident, the jury reasonably could have inferred no one was providing supervisory control over the project. Likewise, given the conflicting accounts regarding proper cross-brace installation (a top-to-bottom method versus a bottom-to-top method), the jury also could have inferred direction was needed to safely complete the steel-erection project.

Viewing this evidence in the light most favorable to the verdict and

23

indulging reasonable inferences in its favor, the jury reasonably could have concluded the lack of a competent person at the job site constituted a failure to use ordinary care in exercising the control retained under the Brazos-T&T subcontract. *See City of Keller*, 168 S.W.3d at 822. The jury's finding that Brazos breached its duty to Jefferson therefore is supported by legally sufficient evidence.

We turn now to our factual sufficiency review, in which we weigh all of the evidence both supporting and contradicting the challenged finding. *See Plas-Tex, Inc.*, 772 S.W.2d at 445. Brazos points to the following testimony to support its factual sufficiency challenge:

- Rutherford agreed it was her duty as the owner of T&T to ensure her workers knew the proper procedure and were qualified to work in a safe and competent manner;

- Jefferson testified that Rutherford sent Javier to the job site to show him how to install cross-braces;

- Charles testified the accident would not have occurred if T&T had provided a supervisor for the job; and

- Charles agreed it was T&T's duty to provide its employees with a safe environment.

This testimony does not show the challenged finding is clearly wrong and unjust. Rutherford's testimony addresses the duty element which, as we discussed above, arises from the terms of the Brazos-T&T subcontract — not from an actual exercise of control. Jefferson's deposition testimony regarding Javier's presence at the site during the accident was contradicted by his testimony at trial, in which he stated that only he, Simon, and James were present when he was hit with the cross brace. Finally, Charles also opined that Brazos failed to have a person on-site to address the crew's problems and that this failure caused or contributed to Jefferson's accident. The challenged finding is not contrary to the overwhelming weight of the evidence and is supported by factually sufficient evidence.

24

## 2. Proximate Cause

The evidence summarized above also supports the proximate cause element of Jefferson's negligence claim. Viewing this evidence in the light most favorable to the verdict, the jury reasonably could have concluded Brazos's failure to have a competent person on the job site was a substantial factor in bringing about Jefferson's accident, without which the accident would not have occurred. *See City of Keller*, 168 S.W.3d at 822. Likewise, factually sufficient evidence supports the jury's proximate cause finding. Even though Brazos cites testimony suggesting Jefferson's accident may have been caused by other factors, the charge's "Proximate Cause" definition stated the accident may have more than one proximate cause. The jury's proximate cause finding is not contrary to the overwhelming weight of the evidence. *See Plas-Tex, Inc.*, 772 S.W.2d at 445.

## C. Jury's No-Liability Finding as to Jefferson in Question No. 5

Question No. 5 asked the jury whether Jefferson's injuries were proximately caused by the negligence of (1) Rutherford d/b/a T&T, (2) Lander d/b/a Rutland, or (3) Jefferson. The jury responded "No" for Jefferson. Arguing this finding is not supported by legally or factually sufficient evidence, Brazos asserts the only supporting testimony comes from Jefferson's uncorroborated version of events.

Our legal sufficiency review credits evidence in support of the verdict if reasonable jurors could do so and disregards contrary evidence unless they could not. *City of Keller*, 168 S.W.3d at 827. Here, reasonable jurors could credit Jefferson's version of events, *i.e.*, that he was hit with the cross brace after Simon failed to grab the top of the brace while it was being carried by the forklift. Jefferson's testimony did not suggest he was at fault with respect to the accident's occurrence. This testimony supports the jury's finding that Jefferson's negligence

25

did not contribute to his injuries.

Although Jefferson's testimony is contradicted by that of Simon (the only other witness to the accident who testified at trial), reasonable jurors could disregard Simon's testimony. Simon's version of events conflicted with that of other witnesses on important details surrounding the accident, namely, how many people were present at the job site and whether Dawlett was there at the time of the accident. Therefore, Simon's testimony did not conclusively prove how the accident occurred and did not render Jefferson's testimony insufficient on this point.

Weighing all of the evidence, the jury's no-liability finding with respect to Jefferson is also supported by factually sufficient evidence. *See Plas-Tex, Inc.*, 772 S.W.2d at 445. Brazos points out that Charles's opinion of the accident's cause was consistent with Simon's recollection of the incident: that the brace "got hung up or stuck" after the crew switched from a bottom-to-top installation to a top-to-bottom installation. Brazos argues that Simon's recollection and Charles's opinion show "Jefferson's negligence was obviously the main — if not the sole — cause of his injuries." But the jury could have credited Jefferson's account and discounted Charles's and Simon's, and we decline to substitute our judgment on this point for that of the jury. *See Francis*, 46 S.W.3d at 242. Weighing the jury's no-liability finding against the contrary evidence, we conclude the finding is not clearly wrong and unjust.

III. **Legally and Factually Sufficient Evidence Supports the Jury's Damages Awards.**

Brazos challenges the jury award of $500,000 for future medical care expenses and $250,000 for future physical impairment, asserting these awards are not supported by legally and factually sufficient evidence. We apply the

26

sufficiency standards articulated above and analyze these awards individually.

## A. Future Medical Care Expenses

To recover for future medical expenses under Texas law, a plaintiff must produce evidence showing a reasonable probability that the expenses will be incurred in the future and the probable cost of such expenses. *See Gunn v. McCoy*, 489 S.W.3d 75, 112 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 554 S.W.3d 645 (Tex. 2018). Although the preferred method of proving these expenses is through expert medical testimony, no precise evidence is required to support an award for future medical costs. *Id.* As with other types of personal injury damages, it is within the jury's sound discretion to determine what amount, if any, to award for future medical expenses. *Id.* "'This standard of review, however, is not so nebulous that a reviewing court will uphold a jury award for future medical expenses when there is no evidence.'" *Id.* (quoting *Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 781 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)).

Registered nurse Valerie Purcell, a certified life care planner, testified with respect to Jefferson's future care and associated costs. Purcell summarized Jefferson's future care into nine different categories: outpatient physician and dental care; procedures and surgeries; outpatient laboratory, diagnostics, and imaging; therapeutic modalities; medical supplies and orthotics; wheelchairs and maintenance; outpatient medications; support services; and domiciliary care. Purcell estimated Jefferson's future medical expenses for a 10-year period would equal $1,213,659. Asserting Purcell's testimony and life care plan are not competent evidence to support the jury's $500,000 award, Brazos points out that Purcell testified she (1) was not qualified to testify regarding medical necessity, and (2) was not testifying to medical necessity with respect to the services and

procedures in the life care plan.

We agree with Brazos's contention — Purcell's testimony alone does not show a reasonable probability that the plan's future medical expenses will be incurred. But certain components of her plan find support in other expert medical testimony; these components support the jury's future medical expenses award.

We begin with the testimony of Dr. Donald F. Cohen, an oral maxillofacial surgeon. Dr. Cohen examined Jefferson's jaws after the May 2012 accident and concluded Jefferson sustained multiple "extremely severe" facial fractures. Dr. Cohen identified (1) an area of Jefferson's left jaw that had failed to heal; (2) that Jefferson had no teeth remaining in his upper jaw and only four teeth in his lower jaw; and (3) an active infection in Jefferson's lower jaw. Dr. Cohen reviewed the "expected procedures and surgeries" component of Purcell's life care plan, which recommended oral maxillofacial surgery and dental restorations that would cost $123,169. Dr. Cohen opined these procedures were reasonably necessary to restore Jefferson's jaw and jaw function and their costs were reasonable for those types of services.

Neurologist Dr. Donald M. Sweighaft testified regarding Jefferson's neurological issues stemming from his injuries. Dr. Sweighaft testified that Jefferson suffered multiple facial fractures, a concussion, an occlusion of the internal carotid artery, and a traumatic brain injury. Dr. Sweighaft stated that Jefferson suffered multiple strokes after the accident; Dr. Sweighaft opined these strokes were caused by the May 2012 accident.

Describing the effects of Jefferson's injuries, Dr. Sweighaft testified Jefferson had impairment of his left hand; "significant deficits" in his executive functioning; and difficulty with memory. Based on a reasonable degree of medical probability, Dr. Sweighaft opined that Jefferson would require assistance for the

28

remainder of his life with personal hygiene, housekeeping, and activities of daily living, and recommended Jefferson reside in an assisted-living environment.

Neuropsychologist Dr. Jon F. DeFrance also evaluated Jefferson with respect to his capacity for independent living. Stating that Jefferson had "significant" deficits with respect to executive functioning and memory, Dr. DeFrance testified that Jefferson "needs an increase in supervision" and, like Dr. Sweighaft, recommended Jefferson reside in an assisted-living environment.

Purcell's life care plan estimated Jefferson's residence in an assisted-living facility would cost $75,920 a year. Kidney specialist Dr. Mohamed Atta opined that Jefferson's life expectancy was 6.4 years. Therefore, based on the estimated costs of living in an assisted-living facility and Jefferson's life expectancy, the evidence supports the conclusion he would require approximately $450,000 in assisted-living care. This evidence, combined with the evidence addressing the oral maxillofacial surgery and dental restorations and the cost thereof, provides legally and factually sufficient support for the jury's $500,000 award for Jefferson's future medical care.

We overrule Brazos's challenge to this portion of the jury's damages award.

## B. Future Physical Impairment

Physical impairment, also called the "loss of enjoyment of life," encompasses the loss of the injured party's former lifestyle. *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 599 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). To support physical impairment damages, the plaintiff must show (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable as pain and suffering, loss of earning capacity, or other damages elements; and (2) these distinct injuries have had a substantial effect. *Id*. "If other

damage elements such as pain, suffering, mental anguish, and disfigurement are submitted, then there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life." *Id*. (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003)).

At trial, Dr. Sweighaft testified that Jefferson would require daily assistance for the remainder of his life, particularly with activities of daily living, personal hygiene, and housekeeping chores. Dr. DeFrance also testified that Jefferson would require daily supervision for the rest of his life. Challenging this testimony, Brazos argues Dr. Sweighaft's and Dr. DeFrance's opinions are conclusory and insufficient to support the jury's $250,000 award for future physical impairment.

"Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (quoting Tex. R. Evid. 401). No-evidence challenges to allegedly conclusory expert testimony require us to examine the record on its face to determine whether the evidence lacks probative value. *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010) (per curiam). An expert must explain the basis of his statements to link his conclusions to the facts; therefore, an expert's opinions must be supported by facts in evidence instead of mere conjecture. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003) (per curiam).

Based on a review of the record, both Dr. Sweighaft's and Dr. DeFrance's opinions are adequately supported by facts in evidence. Beginning with Dr. Sweighaft's testimony, he stated his conclusions were based on a review of Jefferson's medical records and x-rays, including his computed tomography ("CT") and magnetic resonance imaging ("MRI") scans. Dr. Sweighaft also met

30

with Jefferson before completing his report.

Reviewing Jefferson's CT scans, Dr. Sweighaft stated Jefferson suffered multiple facial fractures and an occlusion of his right internal carotid artery. Describing the occlusion as a blood clot, Dr. Sweighaft said the clot was unstable and (based on a review of the CT scan) pointed out that the clot terminated at a location in the brain where the internal carotid artery branches into smaller arteries. Testifying that the blood flow at this juncture carried with it "little pieces of debris" from the clot, Dr. Sweighaft opined that the debris caused Jefferson to suffer the multiple strokes shown in his MRI scan. Dr. Sweighaft said these multiple strokes caused Jefferson to suffer brain injuries and his resulting difficulties with respect to activities of daily living.

Dr. DeFrance testified that his conclusions regarding Jefferson's capacity to care for himself were based on a battery of approximately 50 neuropsychological tests. Based on these tests, Dr. DeFrance concluded Jefferson had significant deficits in executive functioning and memory. Describing Jefferson's memory difficulties, Dr. DeFrance said Jefferson "forgot what [they] were doing that day" and "what was scheduled," and said Jefferson "doesn't remember his medications." Pointing to Jefferson's difficulties with physical movement, Dr. DeFrance also opined that Jefferson would benefit from an assisted-living environment where he would receive adequate supervision and assistance with his medication and nutritional needs.

Dr. Sweighaft's and Dr. DeFrance's conclusions are not conclusory but instead are adequately linked to the facts and evidence in the record. We overrule Brazos's challenge to this portion of the jury's damages award.

**CONCLUSION**

We overrule Brazos's issues on appeal and affirm the trial court's September 15, 2017 final judgment.


/s/    Meagan Hassan
        Justice


Panel consists of Justices Christopher, Hassan, and Poissant (Christopher, J., dissenting).